787 F.2d 1157
 Bankr. L. Rep. P 71,072
In re The PEARSON BROS. COMPANY, an Illinois corporation,
Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,
Appeal of The PEARSON BROS. COMPANY.
 No. 85-1623.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 8, 1985.
Decided April 4, 1986.
As Amended April 11, 1986.
 
 Richard J. Sankovitz, Jenner & Block, Chicago, Ill., for debtor-appellant.
 David B. Radley, Baymiller, Christison & Radley, Peoria, Ill., for appellee.
 Before COFFEY, EASTERBROOK and RIPPLE, Circuit Judges.
 COFFEY, Circuit Judge.
 
 
 1
 The Pearson Bros. Company appeals the decision of the district court reversing the bankruptcy court's entry of judgment in its favor in a suit to recover the setoff of $182,209.23 from its checking account with the First National Bank in Galva. We reverse the decision of the district court and remand with instructions to the district court to enforce the judgment of the bankruptcy court.
 
 I.
 
 2
 The Pearson Bros. Company ("Pearson"), a manufacturer of equipment for the livestock industry, such as liquid manure spreaders and hog crates, is located in Galva, Illinois. In November, 1979, Pearson entered into negotiations with the Bettendorf Bank and Trust Company, ("Bettendorf"), for financing of the completion of its plant expansion and for a line of credit. In August of 1981, Pearson and Bettendorf agreed upon a four and one-half million dollar loan, 90 percent of which was guaranteed by the Farmers Home Administration ("FmHA"). Both the Loan and Security Agreement between Pearson and Bettendorf, as well as the FmHA Loan Guarantee, permitted Bettendorf to enter into a "loan participation agreement."[1] The Loan and Security Agreement signed by Pearson and Bettendorf provided for "participation by a financial institution acceptable to [Bettendorf] and [Pearson] in one-half ( 1/2) of the ten percent (10%) unguaranteed portion of the loan." The FmHA guarantee specified:
 
 
 3
 "The Lender may retain or sell the unguaranteed portion of the loan only through participation. Participation, as used in this instrument means the sale of an interest in the loan wherein the Lender retains the note, collateral securing the note, and all responsibility for loan servicing and liquidation."
 
 
 4
 Shortly after the loan to Pearson was closed, Bettendorf sold a $190,000.00 participation interest in the unguaranteed part of the loan to the First National Bank in Galva ("Galva") and retained the remaining $260,000.00 unguaranteed portion of the loan.[2] Under the loan participation agreement, Bettendorf was responsible for servicing and collecting the loan, with both parties bearing a proportionate share of the collection expenses. No officer of the First National Bank in Galva signed any of the loan documents, nor did the bank's name appear on any of the loan documents entered into between Bettendorf, Pearson or the FmHA.
 
 
 5
 Approximately one year after the loan was closed, Pearson began experiencing financial difficulty and negotiated with Bettendorf to temporarily reduce the interest rate of the loan from 18 percent to 6 percent. Bettendorf, in turn, renegotiated its participation agreement with Galva to reflect the lower interest rate. Although the interest on the note had been successfully renegotiated, Pearson continued to experience financial difficulty and, beginning in August of 1983, failed to make four monthly scheduled payments.
 
 
 6
 On November 21, 1983, Galva wrote Bettendorf a letter pointing out that Pearson's loan was four months overdue and inquiring into the status of the loan. On that date, the unpaid amount due Galva was $182,209.23 and the balance in Pearson's checking account with Galva was approximately $236,000.00. The signature card and account agreement signed by Pearson and Galva provided in pertinent part:
 
 
 7
 "AGREEMENT CONCERNING SETOFF RIGHTS OF FINANCIAL INSTITUTIONS
 
 
 8
 Each depositor, individually and jointly, hereby acknowledges that this financial institution has the right to charge or setoff against any deposit of the depositor with this financial institution any debts or obligations owing by the depositor to this financial institution whether direct or indirect, secured or unsecured, absolute or contingent, joint or several, due or to become due, whether as maker, endorser, guarantor, or otherwise, now existing or hereafter contracted or acquired by this financial institution and wherever payable, and the interest thereon and expense, if any, which may be incurred by this financial institution in connection therewith, and this agreement shall be construed to be the consent of the depositor to make such a charge or set-off against his/her/their account(s) if consent be required by any present or future statute or law."
 
 
 9
 (emphasis added). On November 25, 1983, Galva debited Pearson's checking account in the amount of $182,209.23, the amount due Galva under the participation agreement.
 
 
 10
 Three days later, on November 28, 1983, Pearson filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code and on December 23, 1983, filed a complaint against Galva in the bankruptcy court to recover the amount of the setoff. The bankruptcy court conducted a hearing and all parties agreed that because no officer of the Galva Bank signed the loan participation agreement and the Bank's name did not appear on the document, that there was no "direct obligation" between Pearson and Galva as that term was used on the signature card and account agreement governing Pearson's checking account with Galva. Jeffrey Hatch, the vice president and cashier of Galva, testified that a participation agreement was an indirect obligation or debt:
 
 
 11
 "Q: Well, can you tell us, drawn on that same [banking] expertise, what the term 'indirect obligation' or debt means?
 
 
 12
 A: Indirect would be--it wouldn't require a direct obligation. That any funds owed could be, you know, by guarantee, participation.
 
 
 13
 Q: Okay. Now, which category would a participation fall in?
 
 
 14
 A: I would consider that to be indirect."
 
 
 15
 Elaine Bartholme, the vice president of Bettendorf, also testified as to the meanings of direct and indirect obligations:
 
 
 16
 "Q: Ms. Bartholme, with regard to the characterization of an obligation as direct or indirect, can you explain to the Court what you understand those terms to mean?
 
 
 17
 A: Under normal banking terms, a direct obligation is a promissory note from a debtor directly to a financial institution; for example, Pearson Bros. Company owes money directly to the First National Bank in Galva. An indirect obligation, again under normal banking vernacular, is the debtor owes money to a vendor who sells the note to a financial institution. So, for example, Pearson Bros. Company would purchase a vehicle from Lindquist Ford, the indebtedness would be funded by Lindquist Ford to Pearson. And then Lindquist Ford would sell that to the First National Bank in Galva, usually 100 percent.
 
 
 18
 And then the debtor, Pearson, would pay funds directly to the First National Bank in Galva, who has purchased 100 percent of that indirect obligation. Indirect obligations are often looked at as dealer paper.
 
 
 19
 Q: In a participation, how is that looked on in the bank's books?
 
 
 20
 A: A participation is viewed as an investment in an obligation, of which the debtor may or may not be aware of the fact that there is an investment in their obligation. For example, in the case of Pearson Bros. Company, they owe the money to the Bettendorf Bank, and First National Bank in Galva, purchases or participates, invests in, that obligation owed on the Bettendorf Bank.
 
 
 21
 Pearson Bros. Company may or may not be aware that the First National Bank in Galva is participating. Pearson Bros. Company does not pay the Galva Bank directly for their loan."
 
 
 22
 The bankruptcy judge, in rendering his judgment in Pearson's favor, stated as a finding of fact that a loan participation is not an indirect obligation.
 
 
 23
 "The contract on Galva Bank's signature cards purported to give the bank the right to offset 'indirect' obligations; the court finds that a loan participation is not an indirect obligation of the borrower (such as the purchase of 'dealer paper' from a merchant who sells goods to a debtor and then assigns a conditional sales contract to the banks) but is, rather an investment."
 
 
 24
 Galva appealed the bankruptcy court's decision to the district court. Because the parties agreed and consented in advance to having the bankruptcy court issue findings of fact and conclusions of law and judgment subject to review under only 28 U.S.C. Sec. 158(c), the appeal to the district court was, "taken in the same manner as appeals in civil proceedings generally are taken to the court of appeals...." The parties filed briefs and the district court reversed the decision of the bankruptcy judge, reasoning that under 11 U.S.C. Sec. 553(a), Galva's setoff rights were governed by Illinois law. Pearson filed a motion to reconsider, arguing that Illinois law requires that for the bank to have setoff rights, there must be a mutuality of obligations between the bank and its depositor. Galva responded that the real issue was not whether Pearson's debt to Galva was "mutual," but rather whether the debt was an indirect obligation as that term was used in the account agreement. The district court agreed with Galva's characterization of the issue and entered judgment for Galva holding:
 
 
 25
 "In its ruling, the Bankruptcy Court held that a loan participation is not an indirect obligation of a borrower but is instead an investment. The Court is unable to accept that conclusion. The plain terms of the transaction characterize the nature of the relationship as a loan participation, not as an 'investment.' The loan participation is properly construed as an indirect obligation and as such, is entitled to setoff under Illinois law."
 
 
 26
 On appeal both parties agree that Galva's setoff was proper only if the contract, in this instance the account agreement between Galva and Pearson, specifically authorized the setoff as an indirect obligation or debt.
 
 II.
 A. Standard of Review
 
 27
 Pearson argues that the district court applied an improper standard of review to the bankruptcy court judgment. According to Pearson, the bankruptcy judge relied on extrinsic evidence in interpreting an ambiguous term (indirect obligation or debt) in the contract between Pearson and Galva, the account agreement. Under Pearson's theory, the bankruptcy judge's determination that a loan participation was not an indirect obligation under the account agreement was a finding of fact, which may be overturned only if the district court finds it to be clearly erroneous. An examination of the record reveals that the term, indirect debt or obligation, was not defined in the contract and was the subject of disagreement. To provide a meaning to this contract term, the bankruptcy judge listened to extrinsic evidence, the testimony of Hatch and Bartholme as to the meaning given the term "indirect obligation" by the banking industry. The admission of extrinsic evidence to resolve an ambiguity in a contract is proper. Sunstream Jet Exp. v. International Air Service Co., 734 F.2d 1258 (7th Cir.1984) "In determining whether an ambiguity exists, as a matter of law, the trial court may consider parol and extrinsic evidence.... If ... the court determines that an ambiguity is present in the contract, then the court may permit extrinsic and parol evidence to be introduced at trial, to allow the trier of fact to determine the intent of the parties in entering into the contract." Id. at 1268. When a court interpreting a contract goes beyond the four corners of the contract and considers extrinsic evidence, the court's determination of the parties' intent is a finding of fact. See, id.; Moody v. Amoco Oil Co., 734 F.2d 1200 (7th Cir.1984). Under Illinois law, the law governing the contract between Pearson and Galva, findings of fact based on evidence as to trade usage or custom, such as these witnesses' testimony as to the meaning given "indirect obligations" by the banking industry, is a factual finding. Clark v. General Foods Corp., 80 Ill.App.3d 74, 36 Ill.Dec. 447, 400 N.E.2d 1027 (1980). A district court when reviewing the decision of the bankruptcy court, must accept the bankruptcy court's findings of fact unless they are clearly erroneous, Fed.R.Bankr.P. 8013[3], and the court of appeal's review of the bankruptcy judge's findings of fact is also governed by the clearly erroneous standard of review. In re Kimzey, 761 F.2d 421 (7th Cir.1985). We hold that the bankruptcy judge's determination that a loan participation was not an indirect obligation or debt under the account agreement on file was a finding of fact which may not be set aside unless clearly erroneous. An examination of the district court decision reveals that the district court treated the bankruptcy court's determination as a conclusion of law rather than as a finding of fact. We hold that the district court erred in treating the bankruptcy court's determination (that a loan participation is not an indirect debt or obligation under the contract) as a question of law rather than as a finding of fact, which may not be reversed unless clearly erroneous.
 
 
 28
 B. Review under the Clearly Erroneous Standard
 
 
 29
 The Supreme Court recently reiterated the general principles applicable to appellate review of a finding of fact under the clearly erroneous standard of review.
 
 
 30
 "[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. The reviewing court oversteps the bounds of its duty under Rule 52 if it undertakes to duplicate the role of the lower court. 'In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues de novo.' If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as a trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous.
 
 
 31
 * * *
 
 
 32
 * * *
 
 
 33
 Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable fact finder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination. But when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error."
 
 
 34
 Anderson v. City of Bessemer City, N.C., --- U.S. ----, 105 S.Ct. 1504, 1512-13, 84 L.Ed.2d 518 (1985) (citations omitted).
 
 
 35
 An examination of the record in this case reveals that the only evidence concerning the meaning of indirect obligation came from two witnesses, Hatch and Bartholme. Thus, the bankruptcy judge's determination that a loan participation is not an indirect obligation was based upon the conflicting testimony of two witnesses and must be upheld if the testimony accepted by the trier of fact was coherent, facially plausible and uncontradicted by documentary or objective evidence. Anderson, 105 S.Ct. at 1512-13; Fed.R.Civ.P. 52(a) ("Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of [sic] the credibility of the witnesses.") The question of credibility of witnesses is peculiarly for the trier of fact and an appellate court will not redetermine the credibility of witnesses where the trial court had the opportunity to observe their demeanor and form a conclusion. See United States v. Oregon State Medical Soc., 343 U.S. 326, 72 S.Ct. 690, 96 L.Ed. 978 (1952). In contrast to Hatch's unsupported statement that, "Indirect would be--it wouldn't require a direct obligation. That any funds owed could be, you know, be guarantee, by participation," Bartholme gave examples of direct and indirect obligations and discussed the differences between a loan participation agreement and an indirect obligation, using dealer paper as an example of a typical indirect obligation. Moreover, an examination of the loan documents and the participation agreement reveals that Galva did not sign, nor did its name appear on any of the loan documentation entered into by Bettendorf, Pearson or the FmHA; the loan documents recite that the debt was owed by Pearson to Bettendorf and that Bettendorf held the security interest in Pearson's collateral. Furthermore, both the loan documents and the participation agreement recite that Galva purchased an interest in the loan, and did not occupy the position of co-lender. Based upon the conclusory and unsupported testimony of Hatch in comparison to the coherent and facially plausible testimony of Bartholme and the confirmation of her testimony with documentary evidence, we hold that the bankruptcy judge did not err in accepting Bartholome's testimony to be more creditable than Hatch's as to the meaning of "indirect debt or obligation." Thus, we hold that the bankruptcy court's determination that a loan participation agreement is not an indirect obligation under the account agreement is a finding of fact, is not clearly erroneous, and may not be reversed. Accordingly, we hold that the district court erred in reversing the judgment of the bankruptcy court.
 
 
 36
 The decision of the district court is REVERSED and this case is REMANDED to the district court with instructions to the district court to enforce the judgment of the bankruptcy court.
 
 
 
 [1]
 A loan participation agreement is, "a shared loan, an undertaking by one financial institution, ususally called the 'lead,' to divide a large loan which it has or will put on its books into shares which it then offers for sale to other 'participant' financial institutions. The relations among lead and participants are governed by a participation agreement or certificate...." Armstrong, The Developing Law of Participation Agreements, 23 Bus.Law 689 (1968)
 
 
 [2]
 Bettendorf sold the guaranteed portion of the loan under a separate participation agreement to the Citizen's & Southern Life Insurance Company. The participation agreement with Citizen's is not involved in this lawsuit
 
 
 [3]
 Fed.R.Bankr.P. 8013 (West 1984) provides:
 "On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy court's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."