[648 NYS2d 779]

In the Matter of E. LEO MILONAS, as Chief Administrative Judge of the Courts of the Unified Court System of the State of New York, Petitioner, v PUBLIC EMPLOYMENT RELATIONS BOARD et al., Respondents.

Third Department, October 24, 1996

## APPEARANCES OF COUNSEL

*Kenneth Falk,* New York City *(Michael Colodner, John Eiseman* and *Leonard Kershaw* of counsel), for petitioner.

*Gary Johnson,* Albany, for Public Employment Relations Board, respondent.

*Fulbright & Jaworski, L. L. P.,* New York City *(K. Jane Fankhanel* of counsel), for Association of Surrogate's and Supreme Court Reporters within the City of New York, respondent.

*Joel Giller,* New York City, for District Council 37, AFSME AFL-CIO, respondent.

*Steven A. Crain,* Albany, and *Nancy E. Hoffman* for Civil Service Employees Association, respondent.

### OPINION OF THE COURT

CARPINELLO, J.

At issue in this case is the rate to be paid by the Unified Court System (hereinafter UCS) to court reporters when individual Judges request transcripts of proceedings. In New York, court reporters are compensated in two different ways. They are salaried employees of the UCS, but they are also entitled to payment for transcripts requested by a litigant, by a litigant's attorney and, under certain circumstances, by a Judge.

In 1983, the UCS and a coalition of court reporter unions from across the State entered into a memorandum of understanding (hereinafter MOU) that standardized page format and provided that payment for transcripts was to be based on a per page rate "which shall be defined in and established by the Rules of the Chief Administrative Judge". The MOU provided that effective July 1, 1986, "a court reporter shall be paid $1.375 per page". Although the agreement expired by its own terms in 1987, the parties have been unable to agree upon the terms of a successor agreement.

This agreement was implemented by legislation (L 1984, chs 845, 846) which referenced the promulgation of rules by the Chief Administrative Judge. The Chief Administrative Judge promulgated rules contained at 22 NYCRR part 108 effective July 1, 1984. Both the rules and the enabling legislation provide that the payment schedule would only apply if the UCS was responsible for payment to the court reporter by law.

In 1987, the Court of Appeals issued a decision in the case of *Alweis v Evans* (69 NY2d 199) which resolved a conflict be-

tween Judiciary Law § 299, which provided that stenographic minutes requested by Judges for their own use should be supplied free of charge, and Judiciary Law § 302, which provided that a stenographer was entitled to a fee for supplying a transcript at the request of a District Attorney, Attorney-General, presiding Judge, or any appellate court or Judge. The Court of Appeals held that "where Judges request transcripts imposing the extraordinary demand of daily or expedited copy, compensation at public expense is contemplated by [Judiciary Law] section 302. Correlatively, where regular transcripts are in issue—those which can be supplied under ordinary circumstances after the conclusion of the proceedings—[Judiciary Law] section 299 requires that they be furnished without charge" (*supra*, at 206).

There is ample evidence in the record that, even after the Court of Appeals decision in *Alweis*, a patchwork of inconsistent procedures continued across the State regarding the UCS' compensation of court reporters for transcripts requested by Judges and the rate of such compensation. To a large extent, these inconsistencies hinge upon regionally defined differences between "regular", "daily" and "expedited" copy. As a general rule, "regular" copy appears to refer to copy prepared by the court reporter without any extraordinary time pressure. "Daily" copy generally refers to copy to be produced by the next day, or within 18 to 24 hours. Depending upon the locality, "expedited" copy is produced within three to seven days. In New York City courts from 1986 until 1992, the UCS was paying for *"regular"* copy at the $1.375 rate contained in the 1983 MOU and paid double that rate for copy that was provided either on a next-day or an expedited basis. In the Eighth Judicial District, no payments were made for "regular" copy, and the cost of "daily" or "expedited" copies was the $1.375 contained in the MOU and implementing regulations. In the Third through Seventh and the Ninth Judicial Districts, prior to 1991 no payment was made for "regular" copy but payments were made for "daily" and "expedited" copy. The payment rate for "daily" copy ranged from $1.375 per page to $5 per page, and the payment rate for "expedited" copy ranged from $1.375 per page to $2.75 per page.

In 1989, the UCS issued a court reporter's manual in which it stated that in all circumstances in which the UCS is responsible for payment of transcripts, the rate of payment is "an unalterable $1.375 per page". In 1991, the UCS conducted its own internal audit, which indicated that despite the *Alweis*

decision, transcripts had not been made available to Judges free of charge in accordance with Judiciary Law § 299 and, indeed, in New York City, there was no procedure for requesting transcripts pursuant to that section.

An audit conducted by the Comptroller, released in 1992, similarly showed that Judges were not ordering transcripts pursuant to Judiciary Law § 299 and that court reporters were being compensated at rates other than the $1.375 rate contained in the MOU. This audit also showed that in addition to their base salary of between $42,000 and $60,000 at the time, a number of court reporters were earning an additional $20,000 per year from the sale of transcripts to the UCS and several were earning more than $30,000. These figures did not take into account the additional sums earned by court reporters from the sale of transcripts to litigants and their attorneys.

In December 1991, the Deputy Chief Administrative Judge for courts outside New York City issued a memorandum to District Administrative Judges in which he reiterated that the only authorized rate for payment was the $1.375 rate set forth in the 1983 MOU and referenced in the 1989 court reporter's manual. In January 1992, the UCS allegedly began to reject vouchers that were submitted by court reporters for payment. UCS officials issued additional memoranda that made clear the UCS' position that the only authorized rate for payment was the $1.375 set forth in the MOU.

This conduct touched off the filing of three improper practice charges with respondent Public Employment Relations Board (hereinafter PERB), which are the subject of the instant proceeding. Case No. U-13410 was filed by respondent District Council 37, AFSCME, AFL-CIO, Local 1070 (hereinafter DC 37), which represents approximately 225 reporters who work in the Family Court, Criminal Court, Surrogate's Court and Civil Court within New York City. Case No. U-13431 was filed by respondent Civil Service Employees Association Inc., AFSCME, AFL-CIO (hereinafter CSEA), which represents all court reporters outside New York City except in Nassau, Suffolk, Rockland and Westchester Counties, where it represents only reporters in Supreme Court and the Court of Claims in the State Judiciary negotiating unit that extends State-wide. Case No. U-13412 was filed by respondent Association of Surrogate's and Supreme Court Reporters within the City of New York (hereinafter the Association), which represents approximately 330 reporters employed by the UCS in the Supreme Court within New York City. A joint hearing was held involving the UCS and the parties to each of the three cases.

In case No. U-13410, the Administrative Law Judge (ALJ) found that the UCS had violated Civil Service Law § 209-a (1) (d) (the Public Employees' Fair Employment Act [hereinafter the Taylor Law]) when it terminated the past practice of paying augmented rates for daily and expedited copy and when it ceased paying reporters the base rate set forth in the MOU for regular copy produced before the close of a case and applied this policy to pending vouchers. The ALJ rejected the UCS' argument that it was entitled to rely upon the rate schedule set forth in the MOU for the payment of all transcripts, including daily and expedited transcripts.

The ALJ took special note of the testimony of Lester Kane, a witness called on behalf of the court reporters' unions. Kane had been employed as a reporter from January 1949 until November 1984 and was the chief spokesperson for the coalition of unions that negotiated with the UCS in 1983 regarding the terms of the MOU. Kane testified that because of the extensive differences within the State regarding compensation for daily and expedited transcripts, it was determined to deal only with the issues of standard page size and format and the base rate for payment in the MOU. He testified that it was his understanding that the existing practices involving a higher rate of payment for expedited and daily copy were to continue and survive the agreement. The UCS objected to this testimony based upon the parol evidence rule, which objection was overruled. Based upon Kane's testimony and noting that the UCS had not offered any testimony in rebuttal, the ALJ determined that the rate of payment referred to in the MOU referred only to the rate applicable for regular copy, and not to daily or expedited copy. Finally, the ALJ interpreted the language of the Court of Appeals decision in *Alweis v Evans* (69 NY2d 199, *supra*) to find that the UCS was obligated to continue to pay for regular copy at the base rate if those transcripts were ordered by the Judge prior to the close of a case.

The ALJ reached a similar decision in case No. U-13431, brought by CSEA. In case No. U-13412, brought by the Association, the ALJ found violations in the UCS' termination of its past practice of paying double the base rate to reporters for the production of daily and expedited copy and in ceasing to pay reporters at the base rate for regular copy produced before the close of a case. In both of these cases, the ALJ again relied heavily upon the testimony of Kane.

In its decision in the DC 37 case, dated January 25, 1995, PERB affirmed the determination of the ALJ in its entirety. In

discussing the UCS' parol evidence objection, PERB found that the MOU was inherently ambiguous, requiring clarification in the context of the history of negotiation of the MOU and the long-standing practices leading up to its execution. PERB also agreed with the ALJ that the UCS behaved improperly in ceasing payment for regular copy ordered before the close of a case. PERB incorporated this decision by reference in its January 25, 1995 decision in the case filed by CSEA. In the CSEA case, PERB reversed the ALJ's decision only to the extent that the ALJ had failed to find violations of the Taylor Law in the Fifth and Seventh Judicial Districts.

Finally, in the Association decision, dated March 22, 1995, PERB again incorporated its decision in the DC 37 case by reference. Additionally, however, PERB considered a separate argument not presented by the other two cases—whether the UCS had violated the Taylor Law by reducing the number of indeterminate sentencing transcripts that it purchased from court reporters. In 1970, CPL 380.70 was enacted which required transcripts of indeterminate sentences to be provided to the warden of a prison to which a criminal defendant had been sentenced. Since that time, a practice developed whereby the UCS would purchase three transcripts from court reporters at the price of two. One copy of the transcript was delivered to the correctional facility as required by the statute and the remaining two copies were kept in case of an appeal. The existence of this practice was memorialized in a 1979 memorandum from David Barnes, at that time Deputy Director of Administration for the New York City courts. Beginning in 1992, the UCS began to purchase only one transcript at the $1.375 rate spelled out in the MOU. The ALJ had dismissed the improper practice charge based upon this change, finding that the arrangement referenced in the Barnes memorandum did not constitute an "agreement" for purposes of Civil Service Law § 201 (12). PERB found that there was such an agreement, and further found that even if Barnes had lacked the requisite authority to enter the agreement that it had subsequently been ratified by his superiors.

On or about February 24, 1995, the UCS commenced the instant CPLR article 78 proceeding. An amended notice of petition and petition were served on or about April 21, 1995. The parties stipulated to having the three cases decided in a single proceeding. The proceeding was transferred to this Court because the petition raised a substantial evidence question (*see,* CPLR 7804 [g]).

■ PERB found that the UCS' decision to pay for transcripts at the $1.375 rate contained in the MOU violated Civil Service Law § 209-a (1) (d), which provides that it is an improper employer practice to refuse to negotiate in good faith with the duly recognized representatives of public employees. "The duty to negotiate in good faith includes an obligation to continue past practices that involve mandatory subjects of negotiation, even in the absence of a provision to that effect in the contract" (*Matter of Board of Coop. Educ. Servs. Sole Supervisory Dist. v New York State Pub. Empl. Relations Bd.*, 82 AD2d 691, 693).

The UCS contends that PERB's finding of an improper employer practice is not supported by substantial evidence because it rests exclusively upon the testimony of Kane, which the UCS characterizes as parol evidence. The UCS argues that the 1983 MOU is clear and unambiguous on its face and that the ALJ erred in permitting Kane to testify to extrinsic matters that were inconsistent with the parties' agreement. When parties set down their agreement in a clear, complete document, their writing should be enforced according to its terms, and "[e]vidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing" (*W.W.W. Assocs. v Giancontieri*, 77 NY2d 157, 162; *see, Allyn v Allyn*, 163 AD2d 665, 666, *lv denied and appeal dismissed* 76 NY2d 1005, *lv denied* 77 NY2d 806). It is only when the court finds a document to be ambiguous that it may properly resort to extrinsic evidence, since the words of the agreement are the best indication of the intention of the parties (*see, Mercury Bay Boating Club v San Diego Yacht Club*, 76 NY2d 256, 267). Whether a writing is ambiguous is a matter to be determined by the court (*see, Van Wagner Adv. Corp. v S & M Enters.*, 67 NY2d 186, 191; *Bruni v County of Otsego*, 192 AD2d 939, 941).

Considering the MOU as a whole, as we must (*see, W.W.W. Assocs. v Giancontieri, supra*, at 162; *Papa Gino's v Plaza at Latham Assocs.*, 135 AD2d 74, 76), we simply do not find it to be ambiguous. The MOU provides that payment for transcripts is to be made based on a per page rate as defined in the rules promulgated by the Chief Administrative Judge and establishes a uniform rate of $1.375 per page. The agreement does not distinguish between different types of copy and does not set different rates depending upon the speed with which the transcripts are produced. The rules promulgated by the Chief Administrative Judge define the term "transcript" and further provide that the agreed-upon rate applies only if the UCS is obligated by law to pay for the transcripts.

PERB found that the terms "transcript" and "based on" were inherently ambiguous and that the admission of Kane's parol testimony was therefore warranted. We disagree. The term "transcript" is not inherently ambiguous. Black's Law Dictionary defines "transcript" in part as "[a]n official copy of the record of proceedings in a trial or hearing" (Black's Law Dictionary 1497 [6th ed 1990]). The term "transcript" is defined at 22 NYCRR 108.1 (b) as "a transcription of the stenographic minutes taken by one or more court reporters, constituting a complete record of all court proceedings in a case". In short, we find that the term "transcript" has an ordinary meaning and is not so inherently ambiguous as to require the admission of parol evidence to clarify that meaning.

We do not find the term "based on" to be inherently ambiguous either. The MOU provides that payment was to be made "based on" a per page rate and then defined the level of compensation per page. The clear import of this provision is that court reporters were to be compensated by the page. Indeed, according to Kane's own testimony, this new per page rate marked a dramatic change in the manner in which court reporters were compensated. Previously, court reporters were paid per folio, or 100 words. Although there were roughly two folios per page, the exact number of folios per page varied around the State, resulting in different levels of payment per page depending upon the number of folios per page. Further, respondents' argument that the term "based on" suggests that the $1.375 rate was only intended to serve as a starting point is unconvincing. Such a reading is not implicit in the language of the MOU. More fundamentally, however, the agreement gives no indication as to the manner in which the higher rates for daily and expedited copy would be calculated from this so-called base rate. Thus, while in New York City certain reporters were being paid at double the base rate, the rates apparently being paid for daily or expedited copy elsewhere in the State, though higher than the $1.375 rate, appear to bear no logical or mathematical relation to it.

Although, as respondents point out, evidence of custom or usage may be admissible in certain instances to clarify an agreement, this is only the case if the agreement is found to be ambiguous. " 'Evidence of [custom] is not permitted for the purpose of contradicting the agreements which the parties have made' " (*Matter of Western Union Tel. Co. [American Communications Assn.],* 299 NY 177, 184). Further, it is well established that parol evidence should not be admitted to *cre-*

*ate* an ambiguity in an otherwise clear and unambiguous agreement (*see, W.W.W. Assocs. v Giancontieri*, 77 NY2d 157, 163, *supra*; *Intercontinental Planning v Daystrom, Inc.*, 24 NY2d 372, 379; *see also, Bruni v County of Otsego*, 192 AD2d 939, 942, *supra*; *Vanier v Vanier*, 119 AD2d 903, 904-905). That is precisely what has occurred here. Kane's testimony on the practice of charging augmented rates for daily and expedited copy and his "understanding" that this practice would survive the MOU did not clarify a preexisting ambiguity; rather, it created an ambiguity in an otherwise clear agreement. Kane's testimony is both contrary to the clear language of the MOU and completely inconsistent with the rate structure contained in the MOU. That this testimony was unrebutted is of no legal significance (*see, W.W.W. Assocs. v Giancontieri, supra*, at 161). Thus, we conclude that this testimony constitutes parol evidence that should not have been considered by the ALJ or PERB.

PERB noted specifically in the DC 37 decision, which was incorporated by reference in the other two decisions, that it relied solely upon the parol evidence to determine that the UCS had an obligation to pay for daily and expedited copy at higher rates. Because insufficient evidence is no evidence at all (*see, 300 Gramatan Ave. Assocs. v State Div. of Human Rights*, 45 NY2d 176, 181), we conclude that PERB's determination that the UCS committed an improper employer practice in refusing to pay for transcripts at rates higher than the $1.375 set forth in the MOU was not supported by substantial evidence and should therefore be annulled (*see, e.g., Matter of Finn's Liq. Shop v State Liq. Auth.*, 24 NY2d 647, *cert denied* 396 US 840). Although PERB urges us to remit this matter for further proceedings, the question of whether the MOU is susceptible to the construction urged by respondents is a purely legal question that may be resolved by this Court as a matter of law (*cf., Matter of Association of Secretaries to Justices of Supreme & Surrogate's Cts. v Office of Ct. Admin.*, 75 NY2d 460, 476). We find that the UCS' decision to limit compensation to the $1.375 rate set forth in the MOU constitutes a reversion to the terms of an expired, but nonetheless effective, agreement, which does not constitute a violation of the Taylor Law (*see, e.g., Matter of Local 694, Civ. Serv. Empls. Assn.*, 26 PERB ¶ 3013; *Matter of Maine-Endwell Cent. School Dist.*, 15 PERB ¶ 3025).

■ The UCS next argues that PERB erred in determining that it violated Civil Service Law § 209-a (1) (e) in its refusal to pay for regular copy prepared at the behest of Judges before a

case is closed. This section provides, in pertinent part, that it is improper for an employer "to refuse to continue all the terms of an expired agreement until a new agreement is negotiated". In *Alweis v Evans* (69 NY2d 199, *supra*), the Court of Appeals looked to its earlier decision in *Moynahan v City of New York* (205 NY 181) in reconciling the seemingly inconsistent provisions of the Judiciary Law regarding compensation of court reporters. In *Moynahan*, the Court of Appeals drew a distinction between when a court reporter "at his reasonable convenience and under ordinary circumstances *after a case has been closed*, writes out his minutes and furnishes a transcript thereof" and when a Judge requests a daily copy of the transcript of an ongoing trial; the former should be provided free of charge and the latter should not (*supra*, at 189-190 [emphasis supplied]). In *Alweis*, the Court noted that the relevant inquiry was into "the nature of the transcript ordered, and the required extraordinary service involved in daily copy" (*supra*, at 206). Thus, the Court of Appeals stated that copies should be free of charge if prepared "under ordinary circumstances after the conclusion of the proceedings" (*supra*, at 206).

We read this language as requiring copies to be provided to Judges free of charge if prepared under ordinary circumstances after the conclusion of the proceedings actually transcribed. Even respondents conceded at oral argument that this was a reasonable reading of *Alweis*. Any other reading would, in effect, eliminate *Alweis'* distinction between copies that require extraordinary effort and those that require no such effort in a special category of cases—those cases which have not officially drawn to a close. There is no principled basis for such a distinction. If this line of reasoning were to prevail, the UCS would be required to compensate a court reporter for providing the transcript from the oral argument of a pretrial motion, even if the trial date was months or years away and even if there was no special urgency or extraordinary effort undertaken in the preparation and delivery of the transcript. We do not read *Alweis* so narrowly, nor do we read the Court of Appeals rather narrow decision in *Moynahan* so broadly. We conclude that PERB erred in finding that the UCS had violated Civil Service Law § 209-a (1) (e) in its refusal to pay for regular copy that was prepared in cases that were not yet officially closed. The UCS should only be required to pay for such transcripts if they are prepared with the extraordinary effort and service described by the Court of Appeals in *Alweis*. We would note that the UCS has not challenged that portion of PERB'S deter-

mination in the DC 37 and Association cases that the UCS violated Civil Service Law § 209-a (1) (d) by requiring expedited transcripts to be provided in three business days to qualify for payment.

Finally, PERB also erred in finding that the UCS violated Civil Service Law § 209-a (1) (e) in discontinuing the practice of purchasing three copies of indeterminate sentencing minutes from court reporters for the price of two. There is no written agreement signed by the parties that memorializes this practice. The only evidence of this arrangement is the 1979 internal memorandum prepared by David Barnes. However, the 1983 MOU contains a merger clause that terminates all prior agreements and understandings between the UCS and the court reporters' unions. In light of our conclusion that the 1983 MOU applies to daily and expedited transcripts as well as regular transcripts, we find that the merger clause by its own terms effectively terminated the arrangement set forth in the 1979 memorandum. For that reason, we need not reach the question of whether this memorandum constituted an "agreement" within the meaning of Civil Service Law § 201 (12). We agree with the ALJ that there was similarly no violation of Civil Service Law § 209-a (1) (d). The UCS acted within its managerial prerogative in reducing the number of copies purchased, as this decision regarded the manner and means in which the UCS carried out its duties to the public (see, Matter of Schuylerville Cent. School Dist., 14 PERB ¶ 3035, at 3058; Matter of City School Dist. of New Rochelle, 4 PERB ¶ 3060, at 3706).

MIKOLL, J. P., CREW III, YESAWICH JR. and PETERS, JJ., concur.

Adjudged that the determinations are annulled, without costs, and petition granted.