### In re PAYLESS CASHWAYS, INC.; Debtor.

### Bankruptcy No. 97–50543.

United States Bankruptcy Court, W.D. Missouri.

Nov. 18, 1997.

---

410

Anthony Feeherry, Daniel Glosband, Goodwin, Procter & Hoar, Boston, MA, for Retirees.

Bruce Kratz, New York City, for Petitioner.

John Lewis, Hardwick Law Firm Kansas City, MO, for US Trust Company.

Benjamin F. Mann, Blackwell Sanders, Matheny, Weary & Lombardi, Kansas City, MO, for Debtor.

## MEMORANDUM OPINION

ARTHUR B. FEDERMAN, Bankruptcy Judge.

A group of unsecured claimants (the Claimants) filed a motion to compel separate classification of their deferred compensation claims in this Chapter 11 bankruptcy case. This is a core proceeding under 28 U.S.C. § 157(b)(2)(B) over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1). As announced at the hearing on November 13–14, 1997, I deny claimants' motion for the reasons set forth.

Payless Cashways, Inc. (Payless) filed for relief under Chapter 11 of the Bankruptcy Code (the Code) on July 21, 1997. The First Amended Plan of Reorganization (the Plan)

proposes to place in one class all unsecured prepetition claims not entitled to priority status. This Court has scheduled a Confirmation Hearing on the Plan for November 19, 1997. The Claimants object to the classification of their claim. They contend that certain Senior Subordinate Notes of Payless (the Securities) are subordinated in priority to their claim. At a hearing held on October 9, 1997, I indicated that it did not appear to me, based on a plain reading of the 1993 Senior Subordinate Note Indenture (the 1993 Indenture), that deferred compensation due Claimants was entitled to priority treatment. Prior to so ruling, however, I gave the Claimants the opportunity to prove a contrary meaning. I questioned whether the parties to the 1993 Indenture had actually negotiated the definition of Indebtedness. If so, I questioned whether the parties to the negotiation intended to subordinate the Securities to the deferred compensation claims. Finally, I questioned whether the custom and usage at the time of the 1993 Indenture had a settled meaning. As this issue could have a direct impact on the confirmation process, a separate hearing was scheduled, and the motion to compel separate classification was treated as an objection to confirmation of the Plan.

Nine retirees have joined in this contested matter. The retirees hold claims, scheduled by the debtor, in the amount of $6,497,-021.48.[1] The Court at this time has not been asked to determine the allowable amount of each claimant's claim. Instead, I am simply being asked to determine whether the claims fit within the definition of Indebtedness to which the Securities are subordinated. If I so find, then the Plan, which treats the Claimants and the holders of Securities the same, cannot be confirmed. In order to clarify the Claimants' position, it is necessary to give a brief background of the benefits' packages Payless offered to some of its executives, and a brief background of the 1993 Indenture.

As to the deferred compensation plans, Payless established the first of its two Wealth–Op Deferred Compensation Plans (Wealth–Op) effective March 30, 1986. Employees, who were officers of Payless compensated at Grade 22 or above, and store managers, whose annual compensation was $65,000 or above, were eligible to participate in Wealth–Op. Payless also adopted its Payless Cashways, Inc. Supplemental Retirement Plan (the SERP Plan) effective January 1, 1988. Employees became eligible to participate in the SERP Plan on the date they were named Chief Executive Officer, Chief Operating Officer, Senior Vice–President, or Regional Vice–President. With one exception deferred compensation pursuant to one or the other of these two plans is the basis of the claims of the Claimants. The one exception is a severance pay package in the amount of $214,491 owed to Roger L. Weverka.

As to the 1993 Indenture, on April 20, 1993, Payless issued 9 1/8 percent Securities in the amount of $200,000,000 due April 15, 2003. US Trust Company of New York, Inc. (US Trust), as the Indenture Trustee, filed a Proof of Claim on behalf of the Securities' holders in the amount of $177,924,621.72. This claim represents more than one-half of the total unsecured debt scheduled by Payless. The Indenture Document, drafted by US Trust, defines "Indebtedness," and provides that certain of Payless' obligations are to be treated as "Senior Indebtedness." Based upon those definitions, the Claimants argue that the claim of US Trust must be subordinated to their claims. Thus, the issue in this contested matter is whether the claims of the Claimants are part of Payless' Senior Indebtedness.

I note that at the October 9 hearing, US Trust argued that this Court does not have jurisdiction to construe the Indenture Document. I ruled that the classification of claims, as part of the process of determining whether a Plan of Reorganization is confirmable, is a core proceeding, and that, therefore, this Court has jurisdiction to determine any matter that impacts on the classification of claims.[2]

---

1. Debtor's Ex. "C".

2. See; e.g.,28 U.S.C. § 157(b)(2)(A) and (B); Tranel v. Adams Bank and Trust Co. (In re Tranel),

940 F.2d 1168, 1175 (8th Cir.1991) (stating that a proceeding is core if its resolution ultimately affects distribution of debtor's assets); Resolution

At the hearing the Claimants' case consisted of the testimony of three witnesses. The first two witnesses were former officers of Payless who are now Claimants. Mr. Larry P. Kunz was the Chief Operating Officer (the COO), the President, and a stockholder of Payless at the time of the 1993 Indenture. He testified that he reviewed the Indenture Document prior to issuance of the Securities. He also traveled throughout the United States on a "road show" to promote the sale of the Securities. He testified quite candidly that he never considered the priority of his deferred compensation claims at the time of the issuance. He stated that no one at Payless ever told him that his deferred compensation claims would be senior or subordinate to the holders of the 1993 Securities. He said that he never considered the relative seniority of those claims prior to the bankruptcy filing.

Likewise, Mr. Harold Cohen owned significant shares in Payless in 1993. He was not only a Vice–President of Payless, but was Vice–Chairman of the Board of Directors at the time of the 1993 Indenture. Mr. Cohen testified that he reviewed the Indenture prior to issuance. He also sent a copy of the Indenture to his attorney for review. Like Mr. Kunz, he never discussed the seniority of his deferred compensation claims with anyone inside or outside the company at the time of the 1993 Indenture. Mr. Cohen testified that he resigned from the Payless Board of Directors in June of 1997. At about that time he had at least one conversation with Mr. David Stanley, Chief Executive Officer (CEO) and Chairman of the Board of Directors, about being cashed out of the Wealth–Op Plan and the SERP Plan. He also testified that he contacted his attorney about that same time to try and negotiate a buy-

out. I note that both Mr. Kunz and Mr. Cohen were not only insiders at the time of the 1993 Indenture, but they were at the highest levels of decision-making within the company. They also both admitted that they were given every opportunity to examine the language of the Indenture Document.

■ I turn first to that portion of the language of the Indenture Document that is relevant to the issue here. The Indenture Document defines Indebtedness as follows:

"Indebtedness" of any Person means at any time, without duplication, (i) all Obligations of such Person for money borrowed, (ii) all Obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all Obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person or representing the deferred purchase price of property or services (other than Obligations of such Person constituting trade accounts payable arising in the ordinary course of business) ... [3]

The same document defines Senior Indebtedness to include Indebtedness, with certain exceptions not applicable here.[4] The parties agree that if the deferred compensation claims of the Claimants meet the Indenture Document's definition of Indebtedness, they will also be included in the definition of Senior Indebtedness.

Section 1201 of the Indenture Document requires generally that Senior Indebtedness be paid in full prior to any distribution being made to holders of the Senior Subordinated Notes.[5] Section 1202 of the Indenture Document, however, contains an exception to that subordination provision that is applicable to certain Chapter 11 Plans.[6]

Trust Corporation v. Best Products Co., Inc. (In re Best Products Co., Inc.), 68 F.3d 26, 31 (2nd Cir.1995) (holding that the bankruptcy judge had jurisdiction over a proceeding to enforce a subordination agreement); Official Plan Committee, ASTF, Inc., Con Inc. v. Starshak & Associates, Inc. (In re Balsam Corp.), 185 B.R. 54, 57 (E.D.Mo.1995) (holding that the mere existence of state law claims does not preclude a finding that a matter is core); The Foley Company v. Aetna Casualty & Surety Co. (In re S & M Constructors, Inc.), 144 B.R. 855, 859 (Bankr. W.D.Mo.1992) (stating that core proceedings in-

volve claims that would not exist absent the bankruptcy, such as administrative matters).

3. Debtor's Ex. # 1, pg. 7.

4. Id. at pg. 13.

5. Id. at pg. 77–78.

6. Section 1202 reads as follows:

In the event of (1) any insolvency or bankruptcy case or proceeding, or any receivership, liqui-

The Plan here provides for all unsecured claimants to receive stock in the reorganized Payless. Payless argues that even if Claimants' claims are Senior Indebtedness, entitled to be paid ahead of the Securities, Section 1202 allows equal treatment if a majority of Payless' bank lenders votes in favor of the Plan. Payless contends that the bank lenders have already committed to the Plan.

The exception contained in section 1202 is relevant only if this Court first finds that the Claimants' claims are part of Senior Indebtedness as defined by the Indenture Document. Since the definition of Senior Indebtedness is bound by what is included in the definition of Indebtedness, that definition is dispositive, thus, that will be the focus of this analysis. Moreover, since the Claimants argue that their deferred compensation claims are included in subset (iii) of the definition of Indebtedness, I will limit the analysis to that section.

As I indicated at the October 9, 1997 hearing, a plain reading of subset (iii) indicates that it applies only to "conditional sale or other title retention agreements." If so, then claimants cannot claim senior status based on that provision, since the Claimants do not contend that their claims flow from either a conditional sale or other title reten-

dation, reorganization or other similar case or proceeding in connection therewith, relative to the Company or to its creditors, as such, or to its assets, or (2) any liquidation, dissolution or other winding up of the Company, whether voluntary or involuntary and whether or not involving insolvency or bankruptcy, or (3) any assignment for the benefit of creditors or any other marshaling of assets and liabilities of the Company, then and in any such event:

(A) the holders of Senior Indebtedness shall be entitled to receive payment in full of all Senior Indebtedness, including all amounts due or to become due on or in respect of all Senior Indebtedness, or provision shall be made for such payment in cash or in a manner satisfactory to the holders of such Senior indebtedness, before the Holders of the Securities or the Trustee on behalf of such Holders shall be entitled to receive any payment on account of any Obligations with respect to, including principal of (or premium, if any) or interest on, the Securities; and

(B) any payment or distribution of assets of the Company of any kind or character, whether in cash, property or securities, by set-off or otherwise, to which the Holders or the Trustee would be entitled but for the provisions of this Article Twelve, including any such payment or distribution which may be payable or deliverable by reason of the payment of any other indebtedness of the Company being subordinated to the payment of the Securities, shall be paid by the liquidating trustee or agent or other person making such payment or distribution, whether a trustee in bankruptcy, a receiver or liquidating trustee or otherwise, directly to the holders of Senior Indebtedness or their representative or representatives or to the trustee or trustees under any indenture under which any instruments evidencing any of such Senior Indebtedness may have been issued, ratably according to the aggregate amounts remaining unpaid on account of Senior indebtedness held or represented by each, to the extent necessary to make payment in full of all Senior indebtedness remaining unpaid, after giving effect to any concurrent payment of distribution to the holders of such Senior Indebtedness; and

(C) in the event that, notwithstanding the foregoing provisions of this Section, the Trustee or the Holder of any Security shall have received any payment or distribution of assets of the Company of any kind or character, whether in cash, property or securities, including any such payment or distribution which may be payable or deliverable by reason of the payment of any other indebtedness of the company being subordinated to the payment of the Securities, before all Senior Indebtedness is paid in full or payment thereof provided for in manner satisfactory to the holders of such Senior Indebtedness, then an in such event such payment or distribution shall be paid over or delivered forthwith to the trustee in bankruptcy, receiver, liquidating trustee, custodian, assignee, agent or to the Person Making payment or distribution of assets of the Company for application to the payment of all Senior Indebtedness remaining unpaid, to the extent necessary to pay all Senior Indebtedness in full, after giving effect to any concurrent payment or distribution to or for the holders of senior Indebtedness.

For purposes of this Article only, the words "cash, property or Securities" shall include, without limitation, shares of stock of the Company as reorganized or readjusted, or securities of the Company or any other corporation provided for by a plan of reorganization or readjustment which are subordinated in right of payment to all Senior Indebtedness which may at the time be outstanding to substantially the same extent as, or to a greater extent than, the Securities so subordinated as provided in this Article, except, in each case, shares of stock of the Company as reorganized or readjusted or securities of the Company or any other corporation distributed pursuant to a bankruptcy, reorganization or similar plan relating to such proceeding have been approved by the vote as a class of the lenders which are parties to the Bank Credit Agreement. Debtor's Ex. # 1, pg. 79.

tion agreements. Claimants contend first that their claims for deferred compensation fit within the clause in subset (iii) referring to obligations owed for the "deferred purchase price of services." They then contend that such obligations are Indebtedness, even if they are not "conditional sale or other title retention agreements." Having heard the evidence offered, I remain convinced that the plain reading is correct. Therefore, I find that subset (iii) relates only to conditional sale or other title retention agreements. As a result, the Claimants' unsecured claims are not entitled to senior treatment ahead of the holders of the Securities.

■■■ I begin with a grammatical analysis of section (iii) that I believe would meet the approval of an eighth grade English teacher. Rules of grammar serve an important function because they impart meaning to language.[7] If application of simple rules of grammar produces a plain and natural meaning, that meaning will ordinarily be followed, unless the words chosen are given a different meaning within the industry involved.[8] If application of those rules does not produce a plain and natural meaning, a Court must look to the intent of the parties to fill in that meaning.

Section (iii) provides that Indebtedness includes "all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person or representing the deferred purchase price of property or services (other than Obligations of such Person constituting trade accounts payable arising in the ordinary course of business)."[9] Since the parenthetical phrase does not influence the construction of the sentence, I will eliminate it from the discussion. I will now label the remaining words based upon the grammatical function they perform in the phrase. The word "all" is an adjective, which modifies the noun "obligations". The word "of" is a preposition beginning the prepositional phrase "of such Person." "Person" is a noun, which is the object of the preposition "of," and "such" is an adjective, which modifies the noun "Person." "Under" is another preposition beginning a prepositional phrase "under conditional sale or other title retention agreements." This prepositional phrase contains the compound objects, "sale" and "agreements," and it also modifies the noun "obligations." The noun "sale" is modified by the adjective "conditional," and the noun "agreement" is modified by the adjectives "other" and "title retention." Sequentially, the next word in the phrase at issue is "relating." Grammatically, "relating" is a participle beginning the participial phrase "relating to property purchased by such Person." Likewise, "representing" is a participle beginning the participial phrase "representing the deferred purchase price of property or services." Both of these participial phrases are connected in the disjunctive by the word "or." They must, therefore, be considered together. These two phrases are both participial phrases because they act as adjectives.[10] As adjectives, they must modify either a noun or a pronoun.[11] A general rule of grammar is that a modifier should be placed so that there is no ambiguity as to which subject or verb it modifies. Therefore, participial phrases should be tied to the noun or pronoun they modify, and the noun or pronoun should appear just before or after

**7.** *See generally* Bryan A. Garner, The Elements of Legal Style, Forward by Charles Alan Wright, ix (1991).

**8.** *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (holding that the plain meaning of words should be conclusive, except in the rare case where the literal interpretation produces a result demonstrably at odds with the intention of the drafters). *See also First Brandon Nat'l Bank v. Kerwin (In re Kerwin),* 996 F.2d 552, 556 (2nd Cir.1993); *Citibank, N.A. v. Emery (In re Emery),* 201 B.R. 37, 42 (E.D.N.Y.1996); *Fidelity Part-*

*ners, Inc. v. Philippine Export and Foreign Loan Guarantee Corp.,* 921 F.Supp. 1113, 1118 (S.D.N.Y.1996).

**9.** Debtor's Ex. # 1, pg. 7.

**10.** The Texas Law Review Manual on Usage & Style, ¶ A:1 at 2 (8th ed.1995). *See also* William Strunk, Jr. and E.B. White, The Elements of Style, § I–11 at 13 (3rd ed.1979).

**11.** The Texas Law Review Manual on Usage & Style, ¶ A:1 at 9 (8th ed.1995).

the phrase.[12] Using these basic rules of grammar, I find that the compound participial phrase "relating to the property purchased by such person or representing the deferred purchase price of property or services" can only modify the prepositional phrase "under conditional sale or other title retention agreements," as the two nouns that are the compound objects of the prepositional phrase are the closest nouns to the participial phrases.

Having parsed the clause grammatically, I move to the question of whether the scope of the senior status it grants is limited to "conditional sale or other title retention agreements." Claimants concede that the first participial phrase, "relating to property purchased by such person," refers to and modifies the objects of the immediately preceding prepositional phrase, "under conditional sale or other title retention agreements." Therefore, they concede that as to property purchased the sellers of such property would only have senior status if they sold the property under conditional sale or other title retention agreements. However, as to the next participial phrase, "or representing the deferred purchase price of property or services," movants contend that this phrase does not refer to or modify the objects of the same prepositional phrase. Instead, they contend that it refers to "obligations," the noun that is placed all the way back at the beginning of the phrase. To realize just how strained this interpretation would be, try to diagram this sentence with parallel participial phrases modifying different nouns. It just does not work. Plainly, subset (iii) applies only to conditional sale or other title retention agreements. Therefore, Claimants are not entitled to claim its benefit.

In both the hearing of October 9, 1997, and the hearing on October 13–14, 1997, Claimants emphasized that it is difficult to find specific examples of a conditional sale or title

retention agreement that would include the deferred purchase price of services. Therefore, they contend, subset (iii) must have been intended to apply to something other that conditional sale or title retention agreements. I disagree. The very terms "conditional sale" and "title retention agreements" are now archaic, and were so in 1993, since such transactions were replaced with the adoption of the Uniform Commercial Code (the UCC).

The UCC, as adopted by the State of New York,[13] uses the term conditional sale and title retention agreements when stating the subject matter of Article 9.

> [t]his Article applies to security interests created by contract including pledge, assignment, chattel mortgage, chattel trust, trust deed, factor's lien, equipment trust, *conditional sale,* trust receipt, other *lien or title retention contract* and lease or consignment intended as security. This Article does not apply to statutory liens except as provided in Section 9–310 [14] (emphasis supplied).

Moreover, Article 9 was adopted specifically to replace such transactions as conditional sales and title retention agreements.[15] It is also clear that secured transactions are transactions between sellers and purchasers, not transactions between the purchaser and the purchaser's employees.[16] The Claimants have, therefore, not persuaded me of the correctness of their position on the basis of the fact that Payless and US Trust could not provide contemporary examples within the industry of the use of admittedly dated terminology.

■■■ As to any other ambiguities that exist, it is a maxim of contract construction that a document that is clear and explicit can be construed by an analysis of the four corners of the contract.[17] If, however, either

---

12. Bryan A. Garner, The Elements of Legal Style, § 2.24 at 47 (1991).

13. The 1993 Indenture provides that it is to be interpreted under the New York law. Debtor's Ex. # 1, § 112.

14. N.Y. UCC § 9–102(2).

15. *See* N.Y. UCC § 9–101, Official Comment ¶ 1.

16. Article 9 excludes from its coverage "a transfer of a claim for wages, salary or other compensation of an employee." N.Y. UCC § 9–104(d).

17. *Wing Ming Properties, Ltd. v. Mott Operating Corp.,* 148 Misc.2d 680, 683, 561 N.Y.S.2d 337, 339 (N.Y.Sup.1990), *aff'd,* 79 N.Y.2d 1021, 594 N.E.2d 921, 584 N.Y.S.2d 427 (1992).

the language is ambiguous or there are ambiguities in circumstances or intent surrounding its execution, extrinsic evidence may be offered.[18] But the evidence to be considered is limited to the following: (1) conversations, negotiations, and agreements made prior to or contemporaneous with the contract in question relating to the subject matter of the contract; (2) the purpose or object of a specific provision of the contract; and (3) industry custom and usage.[19] The parties offered a great deal of evidence as to the meaning of the definition of Indebtedness in the 1993 Indenture by making reference to language in both a 1988 Indenture and a 1996 Credit Agreement. That evidence is not relevant as those agreements are not contemporaneous with the 1993 Indenture.

The Claimants offered no evidence that the parties intended the 1993 Indenture to be subordinate to their deferred compensation claims. In fact, as indicated by the archaic language, the evidence offered indicates that the definition of Indebtedness was not negotiated at all. Mr. John Brungardt, attorney for Payless during the negotiation of the 1993 Indenture, had no recollection that the clause was subject to negotiation. Mr. Kunz and Mr. Cohen, in their respective positions as President and COO and Vice–President and Vice Chairman of the Board of Directors, recalled no conversation about this provision.

David Stanley, the CEO now, and at the time of the 1993 Indenture, could recall no discussions regarding this provision. Finally, Payless introduced a Model Revolving Credit Agreement that contained language similar to the language at issue here.[20] For all these reasons, I find that the language used in the definition of Indebtedness is boilerplate. Boilerplate language is "language which is used commonly in documents having a definite meaning in the same context without variation; used to describe standard language in a legal document that is identical in instruments of a like nature."[21] Because the language is standard legal language not subject to variation it is not negotiated by the parties.[22] Language not negotiated by the parties cannot reflect the parties intent.[23] The Second Circuit has held that boilerplate provisions in an indenture should be given consistent uniform interpretation because such provisions are not the consequence of the "relationship of particular borrowers and lenders and do not depend upon particularized intentions of the parties to an indenture."[24] Moreover, uniform interpretation of Indentures is important to the efficiency of capital markets.[25] The Claimants failed to prove the definition of Indebtedness was negotiated. Therefore, while it may be difficult to conjure up examples fitting the plain

**18.** *Id.*

**19.** *Milonas v. Public Employment Relations Board*, 225 A.D.2d 57, 648 N.Y.S.2d 779, 784 (1996) (Citations omitted).

**20.** Deb. Ex. "A" at pg. 5.

**21.** *Greenfield Direct Response, Inc. v. ADCO List Management (In re Greenfield Direct Response, Inc.)*, 171 B.R. 848, 857 n. 5 (Bankr.N.D.Ill. 1994) (quoting Blacks Law Dictionary (6th ed.1990)).

**22.** *Trans-Aire Intern., Inc. v. Northern Adhesive Co., Inc.*, 882 F.2d 1254, 1263 (7th Cir.1989); *Pizza Management, Inc. v. Pizza Hut, Inc.*, 737 F.Supp. 1154, 1183 (D.Kan.1990); *Unique Concepts, Inc. v. Manuel*, 669 F.Supp. 185, 187 (N.D.Ill.1987). *See also, e.g.*, Carroll E. Neesemann and Maren E. Nelson, *The Law of Securities Arbitration*, 949 PLI/Corp. 369, 399 (1996); *An Innovative Theory of Recovery for Patients Injured Through Use or Misuse of Health Care Information Systems*, 14 J. Marshall J. Computer & Information L. 73, 129 n. 167 (1995); Melanie Rouner

Cohen, et. al., *Current Developments in Bankruptcy Reorganization*, 656 PLI/Comm. 637, 650 (1995); Matthew S. Simchak and David A. Vogel, *A Few Words of Advice: Protecting Intellectual Property When Contracting With the Department Of Defense According To the October 1968 Regulations*, 23 Pub. Cont. L.J. 141, 167 n. 75 (1994); Lisa L. Dahm, *Restatement (Second) of Torts Section 324A:*

Mark Roszkowski and John D. Wladis, *Ending the Battle of the Forms: A Symposium on the Revisions of Section 2–207*, 49 Bus. Law. 1065, 1079 (1994); Nancy W. Graml, *Bondholder Rights In Leveraged Buyouts in the Aftermath of Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 29 Am. Bus. L.J. 1, 28 (1991).

**23.** *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2nd Cir.1982), cert. denied 460 U.S. 1012, 103 S.Ct. 1253, 75 L.Ed.2d 482 (1983).

**24.** *Id.*

**25.** *Id.*

meaning of subset (iii), that does not mean the parties to the Indenture intended not to follow the plain meaning. There is no evidence that they ever considered this provision.

Since there was no evidence of the intent of the parties, the Claimants might also have attempted to show that custom and trade practice in the industry support their contention that their claims were intended to be included in the definition of Indebtedness. When contract language is ambiguous, evidence of custom and trade practice may be admitted to arrive at an interpretation.[26] The theory here is that the parties negotiating the document would have been aware of the customary interpretation of such language, so its inclusion can be used to infer intent. Claimants, however, did not show that deferred compensation claims had been found to be included in this definition of Indebtedness in any other indenture documents. They also failed to show that the deferred purchase price of property or services had been found to include deferred compensation. And, most importantly, they failed to cite any authority for ignoring the restriction of subset (iii) to conditional sale or other title retention agreements. Thus, Claimants failed to demonstrate that either the intent of the parties, or custom and usage, should be used to depart from an interpretation of subset (iii) that is grammatically correct.

█ A primary purpose of bankruptcy is to bring about a ratable distribution of assets among all creditors.[27] A party claiming that it is entitled to treatment superior to other creditors has the burden of proving that entitlement. Both Mr. Kunz and Mr. Cohen testified that though they were in decision-making positions at Payless at the time of the 1993 Indenture, they never questioned the priority of their future claims, and they were never told that their claims were includ-

ed within the definition of Senior Indebtedness. Yet, now, they contend that the 1993 Indenture, despite its plain meaning, should be interpreted to give them better treatment than other unsecured creditors. The Code requires that the Plan provide the same treatment for each claim of a particular class.[28] The Claimants have demonstrated no legal or equitable reason to alter that requirement. Therefore, I will interpret the clause at issue in the manner that is gramatically correct.

For all of the above reasons, the motion of the Claimants to compel separate classification, which has been treated as an objection to confirmation, will be DENIED and OVERRULED.

An Order in accordance with this Memorandum Opinion will be entered this date.

---

**26.** *Den Norske Bank AS v. First Nat'l Bank of Boston,* 75 F.3d 49, 58 (1st Cir.1996); *Toren v. Braniff, Inc.,* 893 F.2d 763, 765 (5th Cir.1990); *In re Pearson Bros. Co.,* 787 F.2d 1157, 1160 (7th Cir.1986); *Milonas v. Public Employment Relations Board,* 225 A.D.2d 57, 648 N.Y.S.2d 779, 784 (1996); *Wing Ming Properties, Ltd..v. Mott Operating Corp.,* 148 Misc.2d 680, 683, 561 N.Y.S.2d 337, 339 (1990).

**27.** *Vanston Bondholders Protective Comm. v. Green,* 329 U.S. 156, 161, 67 S.Ct. 237, 239, 91 L.Ed. 162 (1946); *Kellogg v. United States (In re West Texas Marketing Corp.),* 54 F.3d 1194, 1202 (1995); *XL Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.),* 16 F.3d 1443, 1443 (1994).

**28.** 11 U.S.C. § 1123(a)(4).