[746 NYS2d 77]

In the Matter of JONATHAN LIPPMAN, as Chief Administrative
Judge of the Unified Court System of the State of New
York, Petitioner, v PUBLIC EMPLOYMENT RELATIONS BOARD
et al., Respondents.

Third Department, July 18, 2002

**APPEARANCES OF COUNSEL**

*Michael Colodner, Unified Court System,* New York City (*Kenneth Falk* of counsel), for petitioner.

*Gary Johnson, Public Employment Relations Board,* Albany (*Sandra M. Nathan* of counsel), for Public Employment Relations Board, respondent.

*Nancy E. Hoffman, Civil Service Employees Association Inc.,* Albany (*Marilyn S. Dymond* of counsel), for Civil Service Employees Association Inc., respondent.

**OPINION OF THE COURT**

Rose, J.

This proceeding examines the basis for a determination by respondent Public Employment Relations Board (hereinafter PERB) that the Unified Court System (hereinafter UCS) violated the Taylor Law (Civil Service Law art 14) when petitioner unilaterally issued a December 1997 administrative order (hereinafter the Order) amending 22 NYCRR part 108 (hereinafter Part 108) relating to the sale of transcripts of court proceedings by court reporters to litigants.

In addition to their duties in creating the official record of court proceedings, court reporters are required to furnish transcripts to litigants (*see,* Judiciary Law §§ 300, 302) and are entitled to payment of the fee provided in Part 108 (*see, id.;* CPLR 8002). As promulgated in 1986 based on collectively bargained terms, Part 108 permits a court reporter furnishing a transcript to a party other than UCS to receive any fee agreed upon by the reporter and the litigant, and provides, in the absence of a mutually agreed fee, the minimum or default rate of $1.375 per page. Part 108 does not, however, specify the time within which transcripts being prepared at the minimum rate should be completed. Judiciary Law § 302 (1) provides only that such transcripts be prepared "with all reasonable diligence," and the Court Reporters' Manual advises: "Counsel

should be notified when to expect the transcript and should be notified expeditiously of any delays."[1]

In response to the public's ignorance of the minimum rate, the court reporters' failure to give expected transcript delivery dates, and the claims of excessive and nonuniform transcript costs and delivery delays made by litigants, individual attorneys and the New York State Bar Association in its May 1997 "Report on Court Reporter Fees" (hereinafter NYSBA report),[2] petitioner issued the Order to improve public understanding of transcript sales. It sought to do so by setting forth guidelines for the fees per page (hereinafter page rates) for daily and expedited transcripts, and by requiring court reporters to complete and file a UCS-prescribed "Minute Agreement Form" (hereinafter Agreement Form) for each transcript not paid for by UCS.

Specifically, the Order added section 108.2 (b) (2), which provides:

> "Where a court reporter and a private party otherwise enter into an agreement pursuant to section 8002 of the CPLR for the furnishing of a transcript, the following rate maximums should be used as guidelines:

"Expedited copy—$4.40 per page

"Daily copy—$5.50 per page[3]

*"Expedited copy* means production of the transcript within seven calendar days" (22 NYCRR 108.2 [b] [2]).

It also added section 108.4, which provides:

---

1. The purpose of the Court Reporters' Manual, issued by UCS in 1989, "is to provide a uniform guide to operating policies and procedures for court reporters in the [UCS]." The Manual's introduction states that it "sets forth the obligations of official employment and provides guidelines for the administration of court reporting services to ensure that the courts obtain the most efficient service."

2. Both Ann Pfau, UCS's Deputy Chief Administrative Judge for Management and Support, and Scott Karson, Chair of the Committee on Courts of Appellate Jurisdiction, which drafted the report, testified that the NYSBA report recommended that the minimum rate be disseminated to the bar, and that Part 108 be revised to (1) prescribe reasonable uniform rates for daily and expedited copy, (2) prohibit reporters from demanding full prepayment of transcript fees and prescribe a reasonable down payment, (3) require written agreements in a UCS prescribed form and direct their filing to permit monitoring of the fees, volume of orders and completion times, and (4) prescribe a greater number of words per page to reduce costs.

3. The record indicates that these particular rates were based on, and are the same as, the fees charged for expedited and daily copy in the federal courts in downstate New York.

"(a) Each court reporter who furnishes a transcript of a court proceeding shall, at the time the transcript is requested, enter into a written agreement for its production with the person or party requesting the transcript. The agreement shall be made on a form prescribed by the Chief Administrator of the Courts and shall set forth the rate per page, the estimated number of pages, and the date by which the transcript shall be produced.

"(b) Each court reporter who enters into such written agreement shall file a copy of that agreement in the office of the appropriate administrative judge, or his or her designee, no later than seven days after entering into the agreement.

"(c) This section shall not apply where the [UCS] is responsible for payment to the court reporter for the transcript" (22 NYCRR 108.4).

Respondent Civil Service Employees Association, Inc., Local 1000, AFSCME, AFL-CIO (hereinafter CSEA) and others then filed improper practice charges against UCS, alleging that the unilateral amendment of Part 108 violated Civil Service Law § 209-a (1) (d). Under that section, it is an improper practice for a public employer to unilaterally alter the terms and conditions of employment in violation of its statutory duty to negotiate with the certified representative of its public employees (*see, e.g.*, *Matter of Milonas v Public Empl. Relations Bd.*, 225 AD2d 57, 64, *lv denied* 89 NY2d 811; *Matter of State of New York [Div. of Military & Nav. Affairs] v New York State Pub. Empl. Relations Bd.*, 187 AD2d 78, 82). Following a hearing, the Administrative Law Judge (hereinafter ALJ) found that the page rates stated in petitioner's Order were mandatory maximums, rather than advisory guidelines, in derogation of the court reporters' right to negotiate higher rates, and that the mandatory Agreement Form improperly compelled reporters to participate in a new reporting method and enter a written contract for every private transcript. Based on these findings, the ALJ concluded that the Order had a direct impact on the terms and conditions of the reporters' employment, primarily by limiting their compensation, and thereby constituted a violation of Civil Service Law § 209-a (1) (d).

On administrative appeal, PERB affirmed the ALJ's decision, finding that regardless of whether the Part 108 page rates are mandatory or "just guidelines," "the effect of the Order has

been to limit the amount of compensation received by reporters for a transcript provided to private litigants." Finding also that UCS "ties the rate of compensation it pays reporters to their earnings from private transcript production," PERB concluded that the Order "directly affects" the terms or conditions of the reporters' employment. Then, after defining the mission of UCS exclusively as "to dispense justice," PERB held that petitioner's statement of page-rate guidelines is not a matter sufficiently related to that mission to outweigh its impact on reporters' compensation and hours of work. As to the Agreement Form requirement, PERB merely adopted the ALJ's findings.

Petitioner then commenced this proceeding seeking to annul PERB's determination due to a lack of substantial evidence as well as PERB's disregard for UCS's broader mission of assuring timely and affordable access to justice. In response to petitioner's submission of certain documents, PERB moved to strike them from the record as materials not considered in the administrative proceeding. Supreme Court denied PERB's motion to strike, granted CSEA's motion to intervene and transferred the proceeding to this Court.

As a threshold matter, Supreme Court erred in denying PERB's motion to strike because "judicial review of an administrative determination is limited to the record before the agency, and proof outside the administrative record should not be considered" (*Matter of Van Antwerp v Board of Educ. for Liverpool Cent. School Dist.*, 247 AD2d 676, 678). The documents submitted by petitioner include materials not introduced at the administrative hearing. Since these materials are matters outside the administrative record, they cannot be considered by this Court in reviewing the merits of PERB's determination and will, therefore, be deemed excluded from the record (*see, Matter of Margolin v Newman*, 130 AD2d 312, 315-317, *appeal dismissed* 71 NY2d 844).

Turning to the merits of the petition, we begin by noting that in assessing the intent and effects of the Order, PERB ignored the unique aspect of the court reporters' control over court transcripts. There is no real dispute that a court reporter's public employment creates a monopoly and confers a superior bargaining position vis-à-vis any litigant who needs a transcript, but cannot wait for it to be prepared "with all reasonable diligence" at the minimum rate. Court reporters have these private business advantages because the particular reporter who makes the stenographic record of a court proceeding is the sole source of the official transcript and because the

official record is usually essential to the litigant's participation in further judicial proceedings (*see*, CPLR 5525 [a]; 5526 [record on appeal]). Since there is no deadline fixed by statute or rule for a transcript prepared at the minimum rate, the payment of page rates in excess of the minimum rate is routinely necessary to secure timely transcript production. In addition, since the court reporter and the litigant formerly were the only ones who knew the agreed-upon page rate and production date, since the public was largely unaware of the minimum rate, and since it was to the reporter's advantage to perpetuate such ignorance (*see*, *Langer v New York State Off. of Court Admin.*, 2002 WL 449531, 2002 US Dist LEXIS 3267 [WD NY, Jan. 14, 2002]), the fee negotiation process was one-sided, hidden and unpredictable from the public's perspective, and largely escaped oversight by UCS. Consequently, litigants were faced with the dilemma of either paying page rates significantly in excess of the minimum rate[4] or accepting significant delays in transcript production with no guidelines for, or uniformity in, those rates and deadlines.

PERB also misconstrued UCS's mission. As testified to by UCS's witnesses here, and guaranteed by the First, Fifth and Fourteenth Amendments of the US Constitution (*see, e.g.*, *M.L.B. v S.L.J*, 519 US 102, 110-112), the defining mission of UCS is to provide an accessible forum to every litigant seeking redress of grievances (*see*, Trial Court Performance Standards and Measurement System Implementation Manual, Standard 1, "Access to Justice" [Bureau of Justice Assistance, July 1997]). While access to the legal system is an inherent right of citizenship, PERB failed to recognize that it can readily be lost by litigants who lack either the understanding or economic resources needed to meaningfully exercise it.

PERB's position that UCS's mission is exclusively to dispense justice regardless of whether a litigant has meaningful access to justice is outmoded and simplistic,[5] particularly given PERB's recognition in another context that UCS's administrative policies are the means of achieving its mission. PERB has defined "policy" as "the particular objectives of a government or agency thereof in the fulfillment of its mission and the methods, means and extent of achieving such objectives" (*Matter of State of New York*, 5 PERB ¶¶ 3001, 3005).

---

4. Mary Ellen Raftery, a senior court reporter, testified that she ordinarily charges $6 per page for expedited copy and $7 per page for daily copy.

5. The only authority cited by PERB for this position is the 20-year-old trial level decision in *Matter of Evans v Public Empl. Relations Bd. of State of N.Y.* (113 Misc 2d 986, 987-988 [1982]).

"[A] rational distinction has been drawn between the ultimate work product or judicial decisions of the courts which do not constitute the 'policy' of the Judicial Branch, and the auxiliary, administrative decisions regarding the methods of accomplishing UCS'[s] mission; the latter are vested in the Chief Judge, the Chief Administrator, the Administrative Board, the Judicial Conference and certain of their designees * * *. [PERB] has recognized that such administrative decisions amount to 'policy' formulation * * * and 'provide the institutional framework within which the daily business of the judiciary is conducted,' i.e., the issuance of decisions in actions and proceedings * * *" (*Matter of Lippman v Public Empl. Relations Bd.*, 263 AD2d 891, 899-900 [citations omitted]).

Through its narrow view of UCS's mission here, PERB ignored the otherwise obvious dependency of that mission on UCS's administrative policies rationally designed to promote understandable, uniform, timely and affordable access to justice.

Viewing the record against this background, we find merit in petitioner's contention that the evidence does not support PERB's conclusion that the Order altered a term or condition of the court reporters' employment. Thus, even though the determination of whether a public employer's practice affects a term or condition of employment is generally committed to PERB's discretion (*see, Matter of City of Watertown v State of New York Pub. Empl. Relations Bd.*, 95 NY2d 73, 81) and our review is limited to ascertaining whether its determination is supported by substantial evidence (*see, Matter of Benson v Cuevas*, 272 AD2d 764, 765, *lv denied* 95 NY2d 760), we find that PERB's determination here, that the page-rate guidelines constitute an improper employer practice, is unsupported and must be annulled for several reasons.

First, PERB's determination clearly had to be based on a finding of an actual alteration of the terms or conditions of the court reporters' employment (*see, Matter of Levitt v Board of Collective Bargaining of City of N.Y., Off. of Collective Bargaining*, 79 NY2d 120, 126), and PERB purports to find the requisite alteration in a limitation or reduction of the reporters' incomes allegedly caused by the Order. Our review of the record, however, reveals no evidentiary support either for the ALJ's finding that the Order mandates, and thereby expressly limits, the page rates chargeable by court reporters or for

PERB's finding that the effect of the Order has been to limit reporters' compensation. Instead, the record reflects that, despite the use of the term "rate maximums," the stated page rates are only informational guidelines with no proven effect on reporters' compensation.

At the hearing, Ann Pfau, UCS's Deputy Chief Administrative Judge for Management and Support, testified that the Order did not impose any page rates on court reporters and that no reporter has been, or would ever be, disciplined for charging more than the guidelines. Judge Pfau also testified that the purpose of the guidelines is to inform the public and provide persons purchasing transcripts with some guidance regarding appropriate rates. In addition to this testimony, two senior court reporters, called as witnesses by CSEA, agreed that the page-rate guidelines are only suggested rates and that reporters are free to negotiate their rates. While CSEA presented evidence that Robert Bennett, Chief Clerk of the Suffolk County Court, had issued a memorandum characterizing the guidelines as mandatory, Eugene Meyers, Executive Assistant to the District Administrative Judge of Suffolk County, testified that he immediately informed Bennett that this interpretation was erroneous and directed its retraction. Thus, there is no record evidence that the guidelines expressly limited the page rates chargeable by reporters.

Nor is there evidence of any indirect limitation on compensation, despite PERB's holding that the guidelines are ambiguous as to whether or not the page rates are mandatory. Specifically, PERB contends that because the use of the terms "maximum rates" and "should be used" could lead litigants to conclude that the stated page rates are mandatory maximums, reporters are limited in their ability to negotiate their desired page rates. Even though, as suggested by the testimony of Scott Karson, the Chair of the Committee on Courts of Appellate Jurisdiction, the Order is not a model of clarity, there still is no evidence that any litigant ever concluded that the guideline page rates were mandatory or, on that basis, refused to pay a court reporter a higher page rate. The only evidence on this issue is the testimony of Mary Ellen Raftery, a senior court reporter, to the effect that another reporter's bill for a transcript at $8 per page was questioned by the litigant when the latter learned of the guideline rate. On cross-examination, however, Raftery admitted that the other reporter received payment of the full amount billed. Thus, there is no evidence that the guidelines either reduced a reporter's income or

impaired a reporter's ability to negotiate a rate exceeding the guidelines.[6]

Second, PERB's conclusion that the Order directly affects the reporters' compensation is also based on the false premise that "UCS ties the rate of compensation it pays reporters to their earnings from private transcript production." While, as the ALJ found, there was testimony by Lester Kane, a senior court reporter, that UCS considered income from transcripts to be relevant in determining reporters' salary levels during negotiation of the 1979-1982 collective bargaining agreement between the reporters' unions and UCS, there is no evidence that the reporters' UCS salary was ever directly tied to their income from transcripts, or that any reporter's salary was ever reduced or adjusted due to such outside income. Thus, the findings by PERB to that effect have no evidentiary basis.

Third, contrary to PERB's holdings, we perceive no separately negotiable issue concerning the "unilateral" definition of "expedited copy" contained in the Order because the stated page rate necessarily had to be tied to a specific time period. In *Matter of Milonas v Public Empl. Relations Bd.* (225 AD2d 57, 60, *supra*), we noted that, "[d]epending upon the locality, 'expedited' copy is produced within three to seven days." The guidelines, however, in no way preclude the negotiation of other page rates for transcripts to be produced in more or less than seven days. Thus, the fact that "expedited copy" has been otherwise defined is no evidence that the definition in Part 108 affects the terms and conditions of the court reporters' employment.

Fourth, apparently now recognizing that the record may not support its finding of an actual effect on the court reporters' compensation, PERB contends in its brief that even if the page-rate guidelines were not mandatory and no court reporter actually lost income, the Order still would be an improper practice because the guidelines are "related to" or "concern" the reporters' compensation. At oral argument, PERB urged that *any* change to Part 108 constitutes a change in compensation. This position is unavailing, however, for it represents a different basis than that relied upon in PERB's decision and because "judicial review of an administrative determination is limited

---

**6.** Significantly, the UCS court reporters who were plaintiffs in a federal court action challenging petitioner's amendments to Part 108 also were unable to demonstrate an actual impact on their compensation (*see, Langer v New York State Off. of Court Admin.*, 2002 WL 449531, 2002 US Dist LEXIS 3267, *supra* [WD NY, Jan. 14, 2002]).

to the grounds presented by the agency at the time of its determination" (*Matter of Scanlan v Buffalo Pub. School Sys.*, 90 NY2d 662, 678; *see*, *Matter of Scherbyn v Wayne-Finger Lakes Bd. of Coop. Educ. Servs.*, 77 NY2d 753, 758; *Matter of Sokolowski [Commissioner of Labor]*, 280 AD2d 826, 827).

As the record evidence does not establish that court reporters are bound to the page-rate guidelines or have sustained reduction in compensation, the guidelines cannot be deemed to have altered a term or condition of their employment, and PERB's determination that UCS committed an unfair employer practice by unilaterally publishing those guidelines must be annulled. Moreover, even if there were some potential impact, we would find it to be too slight to outweigh the role of the guidelines in fulfilling UCS's mission of facilitating court access (*see*, *Matter of County of Suffolk [Suffolk County Petrolmen's Benevolent Assn.]*, 12 PERB ¶ 4561, *affd* 12 PERB ¶ 3123; *Matter of County of Albany [Albany Police Officers Union]*, 12 PERB ¶ 4563).

Turning next to petitioner's addition of section 108.4 to Part 108 requiring court reporters to complete an Agreement Form for each private transcript, we agree with respondents that this rule does alter some aspects of the reporters' employment. We nevertheless conclude that its promulgation did not violate the Taylor Law because its relatively minimal impact on the reporters was shown to be outweighed by its importance to UCS's mission. The record establishes that the mandated use of the one-page Agreement Form requires court reporters to perform a reporting function slightly greater than previously required by memorializing their agreements to sell transcripts in a writing setting forth the production date and agreed-upon page rate, executed by both parties and filed with UCS, and to publicize the Part 108 minimum and guideline rates by requiring the litigant's signature on the Agreement Form containing this preprinted information.

We are guided by the principle that "certain decisions of an employer, though not without impact upon its employees, may not be deemed mandatorily negotiable 'terms and conditions of employment,' * * * because they are inherently and fundamentally policy decisions relating to the primary mission of the public employer" (*Matter of Board of Educ. of City School Dist. of City of N.Y. v New York State Pub. Empl. Relations Bd.*, 75 NY2d 660, 669; *see*, *Matter of West Irondequoit Teachers Assn. v Helsby*, 35 NY2d 46, 51). In applying this principle, PERB has stated:

"If [a public employer] is faced with an objectively demonstrable need to act in furtherance of its mission, the employer may unilaterally impose work rules which are related to that need, but only to the extent that its action does not significantly or unnecessarily intrude on the protected interests of its employees. Thus, [PERB] must weigh the need for the particular action taken by the employer against the extent to which that action impacts on the employees' working conditions" (*Matter of County of Montgomery [Civil Serv. Empls. Assn.]*, 18 PERB ¶ 3077; *see, Matter of Custodial, Maintenance & Cafeteria Workers [Elmira City School Dist.]*, 25 PERB ¶ 4666; *Matter of County of Suffolk*, 12 PERB ¶ 4561, *supra*).

As considered above, UCS's defining mission is to provide an accessible forum to every litigant seeking redress of grievances, and there can be no dispute that knowledgeable, affordable and timely access to a forum where disputes can be justly and fairly resolved is essential to that mission. Since UCS demonstrated that the Agreement Form promotes the mission by responding to the needs objectively raised by the NYSBA report and other complaints, the balance between the interests of UCS and of the court reporters could be struck in favor of the reporters only if the required use of the Agreement Form significantly or unnecessarily intruded on their protected interests. As we deem the reporters' interest in keeping the public ignorant of the transcript production process and the minimum rate not to be protected, we find that the balance struck by PERB to preserve that interest is not supported by substantial evidence.

Nor does the record support respondents' contention that the information collected and reported through the Agreement Form is intrusive in its impact. Since court reporters were already required to enter into oral agreements to produce private transcripts at specified page rates and to notify counsel of the expected production dates, the additional requirement of creating a written agreement stating those terms is minimally intrusive. Thus, we find that requiring reporters to enter into a written agreement by completing and filing a preprinted one-page form which also states the minimum and guideline rates is the least intrusive way to assure that the litigant knows of these rates while memorializing the terms agreed upon, and does not significantly affect reporters' compensation, off-duty

time or any other condition of their employment (*see, Matter of Levitt v Board of Collective Bargaining of City of N.Y., Off. of Collective Bargaining*, 79 NY2d 120, 131-132, *supra* [requiring public employee to complete a questionnaire disclosing employee debts owed to the City did not alter employment terms or condition]; *compare, Matter of Board of Educ. of City School Dist. of City of N.Y. v New York State Pub. Empl. Relations Bd.*, 75 NY2d 660, *supra* [18-page questionnaire disclosing employee financial data, health and political affiliations was manifestly intrusive]). We also note that there is no alternate method for UCS to obtain the information needed to monitor whether litigants' access to transcripts is timely and affordable, as the court reporters are the only parties under UCS's control who have this information.

Moreover, some of the factual premises underlying PERB's conclusion that the Order's impact on court reporters outweighs UCS's mission are directly contradicted by the record evidence. The ALJ, for example, discredited petitioner's claim that Part 108 was amended partly in response to numerous complaints from attorneys and litigants as being "speculative," and found that Judge Pfau "testified to only one or two complaints over the years." The record, however, indicates that it was Barbara Zahler-Gringer, an assistant deputy counsel to UCS, who testified that she answered only one or two complaints, while Judge Pfau testified on cross-examination that she had received more than 100 such complaints. This evidence and the NYSBA report, in combination with UCS's mission, establish the need for a change in policy in furtherance of the institutional mission. The Agreement Form directly responds to and implements the NYSBA report's recommendations that the minimum rate be publicized, and that written agreements be entered into and filed to permit monitoring of the affordability of page rates and the timeliness of transcript completion. "It thereby brings more light into the bargaining process and removes the disadvantages which go hand-in-hand with lack of information" (*Langer v New York State Off. of Court Admin.*, 2002 WL at \*3, 2002 US Dist LEXIS at \*10, *supra* [WD NY, Jan. 14, 2002]).

In addition to the ALJ's inaccurate characterization of Raftery's testimony regarding a single incident of the Order's alleged impact, PERB exaggerated the error by extrapolating from it to this statement in a footnote to its decision: "In fact, there is evidence in the record that fees that were negotiated between reporters and private litigants were reduced by the

litigants, who accepted the maximum rate set forth in the Order." This unwarranted conclusion also appears to be the basis for PERB's present argument that requiring court reporters to inform litigants of the minimum rate is a disincentive to their negotiation of higher rates. Even if there were an evidentiary basis for this conclusion, PERB's position indefensibly seeks to maintain the reporters' superior bargaining position by perpetuating the ignorance of litigants and their attorneys as to the long-standing minimum rate arrived at by collective bargaining. Accordingly, we also find PERB's determination as to the Agreement Form to be unsupported by substantial evidence.

CREW III, J.P., PETERS, MUGGLIN and LAHTINEN, JJ., concur.

Adjudged that the determination is annulled, without costs, and petition granted.